## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Novell Ohome,

                Plaintiff,

                        Case No. 1:21-cv-368-MLB

v.

United States of America,

                Defendant.

_____/

## OPINION & ORDER

Plaintiff sued the United States, claiming he suffered physical injury and a violation of his constitutional rights when Customs and Border Protection officers used excessive force and illegally detained him during an inspection at the Atlanta airport. The United States moves for summary judgment. (Dkt. 60.) The Court grants in part and denies in part that motion.

## I.    Background

Customs and Border Protection (CBP) is responsible for border security at ports of entry into the United States, including Hartsfield-Jackson International Airport in Atlanta. (Dkt. 67 ¶¶ 2–3.) CBP officers

have broad authority for searching and screening people and goods entering the United States.  (Dkt. 67 ¶ 4–5.)  CBP maintains a database known as TECS that, among other thigs, includes information on people suspected of illegal activity.  (Dkt. 67 ¶¶ 6, 7.)

CBP requires all passengers arriving in Atlanta on international flights to pass through a primary checkpoint.  (Dkt. 67 ¶ 8.)  At that location, CBP officers inspect each passenger's documents and ask routine questions.  (Dkt. 67 ¶ 9.)  If CBP determines nothing is out of the ordinary and the passenger and his or her personal belongings are admissible, CBP clears the passenger for entry into the United States. (Dkt. 67 ¶ 10.)  CBP, however, refers certain passengers to a secondary inspection process.  (Dkt. 67 ¶ 11–12.)  A CBP officer may do this because he or she suspects the person is engaged in illegal activity (like carrying illegal drugs) or for no reason at all other than a random selection.   (Dkt. 67 ¶ 13.)

The secondary inspection may be extensive.  A CBP officer conducts further analysis of each passenger, including by asking the passenger questions about his or her travel, examining the person's travel documents, and searching his or her baggage and electronic devices.

(Dkt. 67 ¶ 16.)  Passengers are not permitted to use cell phones or other electronic devices during the secondary inspection process.  (Dkt. 67 ¶ 18.)  This prohibition applies particularly to passengers suspected of carrying illegal drugs to prevent them from communicating with potential coconspirators or destroying evidence (including electronic evidence that might be on a phone or computer).  (Dkt. 67 ¶ 19.)  As part of the process, passengers referred to secondary inspection must collect their luggage from a baggage carousel located within the inspection area for inspection by the CPB officer.  (Dkt. 67 ¶ 21.)[1]  A CBP officer escorts the passenger to the carousel to ensure the passenger does not evade secondary inspection or discard evidence or contraband.  (Dkt. 67 ¶ 22.)

On January 22, 2019, Plaintiff and his mother arrived in Atlanta on a flight from the Netherlands following a trip to Nigeria.  (Dkt. 67 ¶ 1.) CBP had placed a TECS lookout on Plaintiff, believing he might be

---

[1] Plaintiff disputes this fact, saying the United States's "citation does not support" it and "[t]here is no evidence of a baggage carousel located within the secondary inspection area."  (Dkt. 67 ¶ 21.)  Plaintiff is wrong. The United States cites sworn testimony from a CBP watch commander at the Atlanta airport discussing "a baggage carousel located within the customs inspection area."  (Dkt. 61-3 ¶ 8.)  Videos of the incident also clearly show a baggage carousel within the inspection area.  (Dkt. 62.) Because Plaintiff otherwise does not refute this fact—including by citing any contrary evidence—the Court deems it admitted.

smuggling narcotics.  (Dkt. 67 ¶ 24.)  As a result, CBP referred Plaintiff to secondary inspection, and CBP officers escorted him and his mother to that area.  (Dkt. 67 ¶ 25.)  Once they arrived, Plaintiff and his mother sat down to wait their turn.  (Dkt. 67 ¶ 37.)  Plaintiff was wearing headphones.  (*Id.*)  Before calling Plaintiff to the counter, CBP Officer Ibraheem Ali reviewed system records to learn the reason Plaintiff had been referred to secondary inspection, thus learning of the information he might be smuggling narcotics.  (Dkt. 67 ¶ 38.)  Officer Ali also saw National Crime Information Center records for Plaintiff indicating "assaultive behavior."  (*Id.*)

When Plaintiff and his mother moved to the counter, CBP officers told them they had to collect their luggage.  (Dkt. 67 ¶ 41.)  Plaintiff went to do that, and Officer Ali followed him.  (Dkt. 67 ¶¶ 41, 42.)  The United States claims that, as they approached the carousel, Officer Ali instructed Plaintiff to remove his headphones.  (Dkt. 67 ¶ 43.)  Plaintiff responded, saying that nothing was playing on the headphones, but Officer Ali told him to take them off anyway.  (Dkt. 80 ¶¶ 11–12.)  Plaintiff complied.  (*Id.*)  Plaintiff testified that, after the headphone altercation, Officer Ali said to him, "[Y]ou think you're tough.  If

anything, you'll go to jail and I'll go home." (Dkt. 80 ¶ 17.) Officer Ali admitted saying something like that but not as a threat. Officer Ali says he merely explained that he would arrest Plaintiff if Plaintiff had anything illegal in the luggage but otherwise would allow Plaintiff to leave. (Dkt. 80 ¶ 17.) Officer Ali contends Defendant then said he did not see his luggage, remarked "Let's go," and began walking away from the baggage carousel until Officer Ali told him to stop. (Dkt. 67 at ¶ 43.) Plaintiff says Officer Ali had an aggressive tone when he asked Plaintiff to remove his headphones, that he never attempted to walk away from the luggage belt, that Officer Ali understood "Let's go" to mean the two of them should leave the carousel together, that he never tried to get away from Officer Ali, and that he only took one or two steps until heeding Officer Ali's instructions to stop. (Dkts. 67 ¶ 43; 70-1¶ 16.)

Videos and an audio recording of the incident show what happened

next.[2]  (Dkt. 62.)[3]  Plaintiff pulled his phone out of his pocket.  At the time, he was less than an arm's length away from Officer Ali, who was standing to his left.  (Dkt. 80 ¶¶ 20–21.)  Plaintiff held his phone in his left hand and seemed to be using it with his right hand.  (Dkt. 80 ¶¶ 21–22.)  Officer Ali said something to Plaintiff while Plaintiff was using his

---

[2] At summary judgment, "in cases where video evidence is available, the Court views the facts in accordance with that video evidence, so long as 'there are no allegations or indications that video evidence has been doctored, or that the video shows something different [from] what actually happened.'" *Turner v. Phillips*, 547 F. Supp. 3d 1188, 1200 (N.D. Fla. 2021) (quoting *Varnadore v. Merritt*, 778 F. App'x 808, 812 (11th Cir. 2019)).  Both parties rely on the videos and audio recording, and neither contest their authenticity.

[3] Docket No. 62 contains four videos and one audio recording.  The first video is from a security camera located behind CBP counters in the secondary inspection area and begins with Plaintiff and his mother arriving for inspection.  While the baggage carousel is visible in the back, Plaintiff and Officer Ali are not in frame, and the video does not show their altercation.  The second video (which does not have audio) is from a security camera at the baggage carousel, shows Officer Ali and Plaintiff appear from out of frame, and depicts the "use of force by law enforcement officers . . . that form the basis of [Plaintiff's] tort claims." (Dkt. 60-1 at 5.)  Audio of the incident, which was recorded by Plaintiff on his cell phone, can be synchronized with the second video to provide a better sense of the incident.  The third video is from a security camera in a holding cell where CBP officers took Plaintiff after he was detained and shows his medical evaluation by paramedics.  Finally, the fourth video is also from the holding cell and shows Plaintiff waiting in the cell for a little over an hour.  Contrary to the United States's characterization, the video does not show Plaintiff's actions "through his release following completion of the secondary inspection." (Dkt. 60-1 at 6.)  None of the videos show when Plaintiff was eventually released.

phone.  But there is no recording of what he said.  (Dkt. 62.)  For summary judgment purposes, the United States concedes Office Ali never told Plaintiff he was confiscating Plaintiff's phone or threatened to do so if Plaintiff did not put it away.  (Dkts. 70-1 ¶¶ 33–34; 80 ¶ 29.)  Officer Ali then reached for Plaintiff's phone without explanation.  (*Id.*)  That occurred thirteen seconds after Plaintiff pulled out his phone.  (Dkt. 80 ¶ 26.)  Plaintiff avoided Officer Ali's reach by turning his body to the right and moving his phone beyond Officer Ali's grasp.  (Dkt. 80 ¶ 30.)  Officer Ali then "attempt[ed] an escort hold" on Plaintiff—meaning he tried to place one of Plaintiff's hands behind his pack.  (*Id.*)[4]  Plaintiff continued resisting.

Another officer ran to the scene to assist, with both men trying to secure Plaintiff's arms.  He kept looking over his left shoulder, speaking with Officer Ali.  The force of the two officers pushed Plaintiff forward, but he could not walk forward as his feet were up against the baggage carousel.  The officers' momentum caried Plaintiff and Officer Ali onto

---

[4] The United States characterizes Officer Ali's actions as "tr[ying] to put [Plaintiff] in a law enforcement hold to gain control over him," while Plaintiff says Officer Ali "violently twist[ed] [Plaintiff's] arm."  (Dkt. 67 ¶ 46.)  The undisputed fact is that Officer Ali put his hands on Plaintiff in order to restrict Plaintiff's movement.

the carousel with the other officer struggling with Plaintiff while maintaining his footing.[5]   A kind of wrestling match ensued.   Plaintiff used his arms and legs to resist the officers' efforts, and they tried to subdue him.[6]  Additional officers arrived and helped pin Plaintiff down. As the struggle continued, one of the officers shouted, "spray," and Officer Ali sprayed Plaintiff with some kind of pepper spray.  (Dkt. 67 ¶ 49.) Multiple officers moved Plaintiff from the luggage belt to the ground and (finally) placed him in handcuffs.  Officers stood Plaintiff up and escorted

---

[5] The United States says, "in the struggle, [Plaintiff] and the two officers fell toward the baggage claim carousel belt, resulting in [Plaintiff] landing on the belt on his left side, Officer Ali falling over him, and [the other officer] with his feet on the floor and trying to regain his balance." (Dkt. 67 ¶ 47.)   In a post-arrest report, Officer Ali wrote he "forced [Plaintiff] onto the baggage belt."  (Dkt. 61-5 at 5–6.)  It also appears from the video that the two officers (or their momentum) shoved Plaintiff onto the belt.   This may be merely a difference in verbiage rather than a factual inconsistency and it really does not matter.  The fall resulted from Officer Ali's initial attempt to restrain Plaintiff.

[6] The parties again differ in their characterizations.  Plaintiff says, as the belt continued moving, the officers "continued to forcefully hold [Plaintiff] down on the baggage carousel" and there was "[n]o resistance."  (Dkt. 67 ¶ 48.)  The second video belies Plaintiff's claim, as it clearly shows him kicking his legs and trying to move Officer Ali off him while he shouts, "what the f*ck are you doing, bro?" and "get the f*ck off me, bro."  Several individuals can also be heard shouting "stop resisting."  (Dkt. 62.)  Again, this does not really matter at this point in the case.  Perhaps it will matter to a jury but, for now, the extent of the wrestling and who made what move while on the baggage carousel does not change the outcome.

him away from the baggage area.  CBP officers held Plaintiff in a holding cell, where he talked with officers and received care from paramedics. CBP later released Plaintiff and his luggage for entry into the United States.[7]

Plaintiff sued the United States for excessive force and unlawful detention under the Fourth Amendment and for assault, battery, false imprisonment, and negligence under Georgia law.  (Dkt. 1.)

## II.   Discussion

### A.   Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357

---

[7] It is unclear exactly when CBP released Plaintiff and his luggage.  The videos do not show Plaintiff's release.  In contending Plaintiff and his bags were released following completion of his secondary inspection, the United States cites a declaration from a CBP watch commander that describes the typical inspection process.  (Dkt. 61-3.)  But just because that is the typical process does not mean CBP followed it in Plaintiff's case.

F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## B.   Sovereign Immunity

The United States says it is entitled to sovereign immunity from Plaintiff's claims.  (Dkt. 60-1 at 14.)  Specifically, it argues that, because "the torts alleged by [Plaintiff] arose from the inspection, seizure, or detention of goods," his claims are barred by the customs-duty exception to the Federal Tort Claims Act (FTCA).  (*Id.*)  Plaintiff says that exception is inapplicable because the FTCA's carve-out from sovereign immunity for intentional torts committed by federal law enforcement officers trumps the customs-duty exception.  (Dkt. 66 at 7–8.)  Plaintiff is right.

"Waiver of sovereign immunity is a jurisdictional prerequisite in

10

the nature of . . . subject matter jurisdiction, in that unless sovereign immunity can be waived, there may be no consideration of the subject matter." *Edwards v. United States Dep't of Justice*, 43 F.3d 312, 317 (7th Cir. 1994).  Under sovereign immunity principles, a litigant may sue the United States only if and to the extent the United States consents. *United States v. Dalm*, 494 U.S. 596, 608 (1990).

The FTCA provides a partial waiver of sovereign immunity for tort claims against the United States arising from employment-related conduct of federal employees.  28 U.S.C. § 2679.  The statute is the exclusive remedy against the United States for such claims.  *United States v. Smith*, 499 U.S. 160, 166 (1991).  To state a claim upon which relief can be granted *and* establish a court's subject matter jurisdiction over the claim, a plaintiff suing under the FTCA must show his or her claims are:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Brownback v. King*, 141 S. Ct. 740, 746 (2021).

There are several statutory exceptions to the FTCA's waiver of sovereign immunity.  *See* 28 U.S.C. § 2680.  One of those is called the "customs-duty exception."  It provides that the FTCA does not waive immunity for "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer." 28 U.S.C. § 2680(c).  The Supreme Court has held this exception covers any claim "'arising out of' the detention of goods," and includes claims resulting from "negligent handling or storage of detained property."  *Kosak v. United States*, 465 U.S. 848, 854 (1984); *see also Davis v. Dotson*, 2021 WL 5353099, at *2 (11th Cir. Nov. 17, 2021) (under § 2680(c), "FTCA waiver of sovereign immunity does not apply to claims against law enforcement officers 'arising in respect of' the 'detention' of property").

A second exception is called the "intentional tort exception."  It lists several intentional torts for which the United States does not waive sovereign immunity, including "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."  28

U.S.C. § 2680(h).  This exception, however, has a carve-out proviso listing several intentional torts for which the United States *does* waive sovereign immunity, provided the tort was committed by an "investigative or law enforcement officer."  *Id.*  These torts include "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  *Id.*  The statute defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  *Id.*

Reading these two exceptions together seemingly raises a conflict. On one hand, the customs-duty exception (that is, § 2680(c)) maintains sovereign immunity for any activity even remotely related to an officer's official duties arising out of the detention of goods.  On the other, the carve-out proviso of the intentional tort exception (that is, § 2680(h)) waives immunity for any intentional assault, battery, false imprisonment, abuse of process, or malicious prosecution committed by federal law enforcement officers.

The Eleventh Circuit has not examined how these two subsections interact with one another—that is, what happens when a customs officer

commits an intentional battery while engaged in his official actions at the border. It has, however, analyzed the interplay between the carve-out proviso of § 2680(h) and another exception to waiver known as the discretionary function exception. *See Nguyen v. United States*, 556 F.3d 1244, 1252–53 (11th Cir. 2009). That exception "generally shields the government from tort liability based on the acts or omissions of federal agencies and employees when they are exercising or performing a discretionary function." *Id.* In *Nguyen*, the Plaintiff sued the United States for false arrest and other torts, claiming a DEA agent had arrested him on baseless allegations and that (even though the prosecutor quickly dismissed all charges) the arrest destroyed his medical practice. *Id.* at 1250. Plaintiff argued his tort claim fell within the carve-out proviso of § 2680(h). The United States argued that—regardless of that proviso—it was immune from liability for the DEA agent's actions because the agent had been performing a discretionary function in seeking Plaintiff's arrest. *Id.* at 1250. The Eleventh Circuit accepted the United States's contention that the agent was performing a discretionary function but still rejected the United States's claim of immunity. *Id.* at 1260. The Eleventh Circuit explained that "[t]wo fundamental canons of statutory

construction" led to the conclusion that, to the extent of any overlap and conflict between the intentional tort proviso [at § 2680(h)] and the discretionary function exception [at § 2680(a)], the proviso wins. The Court explained:

> First, the § 2680(h) proviso, which applies only to six specified claims arising from acts of two specified types of government officers, is more specific than the discretionary function exception in § 2680(a), which applies generally to claims arising from discretionary functions or duties of federal agencies or employees. The canon is that a specific statutory provision trumps a general one.
>
> * * *
>
> Second, the § 2680(h) proviso was brought about through an amendment enacted in 1974, while the (a) subsection has been part of the statute since 1946. When subsections battle, the contest goes to the younger one; the canon is that a later enacted provision controls to the extent of any conflict with an earlier one.

*Id.* at 1252–53 (internal citations omitted). Ultimately, the Eleventh Circuit concluded "if a claim is one of those listed in the proviso to subsection (h), there is no need to determine if the acts giving rise to it involve a discretionary function; sovereign immunity is waived in any event." *Id.* at 1257. The Eleventh Circuit's rationale applies with equal force to any conflict between the intentional tort proviso at § 2680(h) and the customs-duty exception at § 2680(c): § 2680(h) is more specific than

15

§ 2680(c) and postdates § 2680(c) by decades.[8]

The United States points out that two other circuit courts have concluded the opposite: that the customs-duty exception in § 2680(c) trumps the carve-out proviso in § 2680(h).  (Dkt. 60-1 at 16–17.)  It appears the Ninth Circuit was first to tackle the issue.  *See Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994).  In *Gasho*, the court said "§§ 2680(c) and 2680(h) must be interpreted in a manner that reconciles them, without doing violence to either." *Id.*  In purportedly reconciling the provisions, the Ninth Circuit held that so long as the United States shows the alleged tortious conduct "falls within the scope of activities exempted in § 2680(c), . . . the claim is barred." *Id.*  The Ninth

---

[8] While it plays no factor in the Court's reasoning, the Eleventh Circuit's discussion of the legislative history of § 2680(h)'s carve-out proviso lends further credence to the Court's conclusion.  In *Nguyen*, the Eleventh Circuit explained: "In enacting that proviso in 1974, Congress made a major change in the law regarding sovereign immunity for certain types of claims arising from intentional torts by particular types of officers.  Up until that time subsection (h), which had been enacted in 1946 without the proviso, left sovereign immunity in place as far as eleven listed intentional torts were concerned." 556 F.3d at 1253.  In rendering the United States liable for the six intentional torts listed in § 2680(h) when committed by investigative or law enforcement officers, Congress sought to "ensure that future victims of these kinds of torts inflicted by federal law enforcement officers or agents would have a damages remedy against the United States." *Id.* at 1255.

Circuit's reasoning stemmed from a previous decision—interpreting §
2680(c) as it relates to tax collection claims—holding an IRS agent was
not protected by § 2680(c) "insofar as his alleged tortious conduct did not
constitute an 'assessment' or 'collection' of a tax, within the strict
meaning of those words." *Id.* (quoting *Wright v. United States*, 719 F.2d
1032, 1035–36 (9th Cir. 1983)). Based on that holding, the Ninth Circuit
simply (and without reason) applied the inverse—that the United States
can rely on the customs-duty exception (even if § 2680(h)'s carve-out
would otherwise apply) if it shows the conduct *does* fall within the strict
language of that provision. In reaching the same conclusion, the Fifth
Circuit based its decision entirely on *Gasho*:

> As this court explained in *Jeanmarie* [*v. United States*, 242
> F.3d 600, 604 (5th Cir. 2001)], "[w]e agree with the Ninth
> Circuit that '[w]hen strictly construed in light of § 2680(c), the
> waiver of immunity in § 2680(h) applies only to tortious
> conduct not involving the seizure and detention of goods by
> Customs.'" 242 F.3d at 604–05 (quoting *Gasho*, 39 F.3d at
> 1433–34); *see also Davila* [*v. United States*], 713 F.3d [248,]
> 256 [5th Cir. 2013) ("[E]ven intentional torts committed by
> law enforcement officers are exempt from FTCA suits when
> such torts were committed during circumstances that would
> warrant a detention-of-goods exception.").

*Angulo v. Brown*, 978 F.3d 942, 953 (5th Cir. 2020).

The problem with *Gasho* and its progeny (aside from their

questionable inverse reasoning) is that they do not examine the plain language of § 2680*(h)*. Critically, that provision says it "*shall* apply to *any claim*" for its six listed intentional torts "arising, on or after the date of" its enactment. 28 U.S.C. § 2680(h) (emphasis added). It does *not* say it shall apply to any listed intentional tort "except those that would fall under the protection of § 2680(c)." But that is basically what the *Gasho* court wrote into the statute. If Congress wanted to except such conduct from the carve-out, it could—and should—have done so.[9]   Section 2680(h), however, is clear: the United States waives immunity to suit for *any claim* of intentional assault, battery, false imprisonment, false

_____

[9] Tellingly, Congress did not reference *any* of § 2680's other exceptions in § 2680(h)'s carve-out proviso. This begs the question: does *Gasho* mean the carve-out proviso is inapplicable any time a plaintiff's claim implicates another exception? The United States seems to suggest it does not, pointing out Plaintiff "does not show where the Fifth Circuit's statutory interpretation has been applied other than where § 2680(c) is implicated based on detention of goods by Customs." (Dkt. 70 at 6.) That's the point. *Gasho* and its progeny offer no good reason for ignoring the plain language of § 2680(h) and treating § 2680(c) differently from the rest of the statute. It would make little sense to except from the carve-out proviso the inspection, seizure, or detention of goods by federal Customs agents when the proviso expressly defines investigative or law enforcement officers as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). CBP officers perform all those functions.

arrest, abuse of process, or malicious prosecution committed by an investigative or law enforcement officer. *See CSX Corp. v. United States*, 18 F.4th 672, 680 (11th Cir. 2021) ("When the words of a statute are unambiguous, . . . judicial inquiry is complete.").

Section 2680(h)'s carve-out proviso plainly applies here.  Plaintiff claims Officer Ali—a federal Customs officer with authority to seize his property and detain him—intentionally and wrongly assaulted, battered, arrested, and imprisoned him.  Because Plaintiff's tort claims squarely fall within § 2680(h)'s carve-out proviso, it does not matter whether Officer Ali's conduct would otherwise be insulated by § 2680(c).  The United States has waived sovereign immunity over the claims.

The customs-duty exception *does*, however, insulate the United States from liability for Plaintiff's claim of intentional infliction of emotional distress because that tort is not listed in § 2680(h)'s carve-out proviso.  Plaintiff, in fact, concedes that claim "must be dismissed." (Dkt. 66 at 19–20.)  Similarly, the customs-duty exception forecloses Plaintiff's negligence claim, which does not fall within the carve-out proviso.  Plaintiff seeks to avoid this by arguing "no detention, seizure, or inspection of goods had begun" at the time of the physical altercation.

19

(Dkt. 66 at 11).   CBP officers, however, had already begun their secondary inspection of Plaintiff and the physical altercation occurred during that inspection, specifically while attempting to locate Plaintiff's luggage as part of the process.   So, regardless of whether Officer Ali's subsequent actions were reasonable, they undoubtedly flowed from the "inspection" or "detention" of "goods," and Plaintiff's claim those actions were negligent is barred by § 2680(c).   *See Angulo*, 978 F.3d at 953 (§ 2680(c) applied because officer had begun primary inspection of plaintiff's vehicle even though officer had not yet started secondary inspection).

## C.   Supremacy Clause

The United States says Plaintiff's state law claims are also barred by the Supremacy Clause to the Constitution.   (Dkt. 60-1 at 18.) Specifically, it argues it cannot be held liable under state tort law because that law directly conflicts with federal law by creating liability for Officer Ali's "necessary and proper actions to further an essential federal function of border security." (Dkt. 60-1 at 19–20.)  Plaintiff counters that the United States "does not discuss what state law" applies or "how it might impede [Officer] Ali from performing his required federal functions" and the Supremacy Clause does not bar claims against

excessive force.  (Dkt. 66 at 24–25.)[10]

Where a "case involves the actions of federal officers charged with safeguarding the United States border," the court must examine "the extent to which those actions may be regulated by application of state law." *Denson v. United States*, 574 F.3d 1318, 1345 (11th Cir. 2009).  The proper analysis is "whether the officer's acts have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law." *Id.* at 1348.  If the answer "is yes, application of state law, to the extent it unavoidably conflicts with federal law, has no effect, as it would frustrate and impede the compelling federal interest of allowing federal officers to effectively discharge their duties." *Id.*  So, whether the Supremacy Clause bars Plaintiff's state law claims depends on the legality of Officer Ali's actions under federal law.  In other words, to avoid Supremacy Clause problems, Plaintiff must show that any state law violation also violated some federal law.  Plaintiff says

---

[10] In their briefing, the parties did little to help the Court in reaching a decision on this issue.  (Dkt. 76.)  So, the Court held an evidentiary hearing.  (Docket entry dated 05/17/23; Dkt. 76.)  At the hearing, the Court ordered the parties to file a joint statement of undisputed facts related only to the Supremacy Clause issue.  (Dkt. 79.)  The Court relies in part on that joint statement in reaching its decision.

there are genuine issues of material fact about whether Officer Ali violated the Fourth Amendment by using excessive force against him, thus foreclosing summary judgment on the Supremacy Clause issue. (Dkt. 66 at 19–20.)  The Court agrees.

"[T]he proscriptions found in the Fourth Amendment impose a benchmark of reasonableness upon the exercise of governmental discretion." *Denson*, 574 F.3d at 1338 (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  Whether a search or seizure is constitutionally reasonable is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *United States v. Montoya de Hernández*, 473 U.S. 531, 537 (1985).  Certainly, "the expectation of privacy [is] less at the border than in the interior," so "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government at the border." *Montoya de Hernández*, 473 U.S. at 539–40.  Still, "Fourth Amendment protections apply irrespective of a person's location." *Denson*, 574 F.3d at 1339; *see also Castellanos v. United States*, 438 F. Supp. 3d 1120, 1129 (S.D. Cal. 2020) ("Both border enforcement and

traditional law enforcement are cabined by existing Constitutional standards.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975)).

"Excessive-force claims are fact-specific; whether the force an officer uses is reasonable 'requires careful attention to the facts and circumstances of each particular case.'" *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). At summary judgment, courts ask "whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." *Id.* (citation omitted). The "absence of a legitimate law enforcement justification for using force is indicative of excessive force." *Richmond v. Badia*, 47 F.4th 1172, 1182 (11th Cir. 2022).

Resolving all inferences in favor of Plaintiff, a reasonable jury could conclude Officer Ali used excessive force against Plaintiff. There are genuine issues of material fact regarding whether Plaintiff's act of resisting Officer Ali's attempt to take his phone warranted Officer Ali's response in trying to place him into an escort hold and ultimately—along with another officer—shoving him onto the baggage carousel. For

23

purposes of summary judgment, the United States concedes Officer Ali did not tell Plaintiff why he was taking his phone.  Plaintiff testified he resisted to Officer Ali because he did not understand what Officer Ali was doing and thought Officer Ali was reaching for his phone "for no reason." (Dkt. 73-1 at 44:12–24.)  Given the quick nature of the encounter—and Officer Ali's lack of warning—a jury could find Plaintiff's reaction was reasonable.   This would render Officer Ali's subsequent conduct in shoving him onto the baggage carousel unreasonable, violative of the Fourth Amendment, and (thus) unprotected by the Supremacy Clause. *See Richmond*, 647 F.3d at 1289 ("unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment"); *Castellanos*, 438 F. Supp. 3d at 1136 ("passive or minor resistance to arrest alone does not constitute an immediate threat justifying the use of intermediate force").

The United States says the undisputed evidence shows Officer Ali was simply doing "what was essential to carry out [his] border security functions."  (Dkt. 60-1 at 20.)  The Court acknowledges that officers at the border have great leeway and authority.  *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (explaining officers have "plenary

24

authority to conduct routine searches and seizures at the border")
(citation omitted). And that certainly extends to confiscating someone's
phone as part of an investigation, particularly if an officer has reason to
believe someone is deleting information from the phone. But it is not
clear to the Court how Officer Ali's conduct was "essential" in that regard.
While the United States argues Officer Ali needed to confiscate Plaintiff's
phone in case he was trying to destroy evidence or warn potential co-
conspirators, Officer Ali testified he had no intent to search Plaintiff's
phone prior to reaching for it (Dkt. 70-1 ¶ 28); he never told anyone he
was concerned about Plaintiff communicating with "co-travelers" (Dkt.
70-1 ¶ 30); he did not view Plaintiff's use of his phone as an immediate
physical threat (Dkt. 70-1 ¶ 35); and Plaintiff may have told Officer Ali
that he was using his phone to record their encounter (Dkt. 74-1 at
104:14–19). There is no evidence Officer Ali ever instructed Plaintiff to
put his phone away or that Plaintiff otherwise knew he could not use his
phone in the secondary inspection area. Any one of these facts might
change the outcome completely. But they do not exist here. All the Court
can tell from the video is that Officer Ali reached for Plaintiff's phone
thirteen seconds after Plaintiff pulled it out of his pocket; that Plaintiff

quickly turned to the right; and that Officer Ali then proceeded (along with another officer) to forcefully push Plaintiff down onto the baggage carousel.  A reasonable jury could reject Officer Ali's justification and find his actions unreasonable.

Because a reasonable jury could find Officer Ali violated state tort law in a manner that also violated the Fourth Amendment, the Supremacy Clause does not (as a matter of law) bar Plaintiff's state law claims arising from the same conduct.  Given the fact-intensive nature of determining whether Officer Ali used excessive force against Plaintiff, the Court refuses to grant summary judgment.

### D.   Merits

The United States says—immunity questions aside—Plaintiff's claims fail on the merits.  (Dkt. 60-1 at 20.)  Plaintiff concedes his claim for intentional infliction of emotional distress fails as a matter of law.  (Dkt. 66 at 19–20.)  But, he says, his other claims survive.  (Dkt. 66 at 20.)  The Court examines Plaintiff's claims under Georgia law.  *See Gomez v. United States*, 601 F. App'x 841, 851 (11th Cir. 2015) ("The FTCA demands that federal courts apply the law of the situs state to determine whether a tort claim has been stated.") (citing 28 U.S.C. §

26

1346(b)(1)).[11]

### i. Assault and Battery

The United States says Plaintiff's claims for assault and battery fail as a matter of law because (1) Officer Ali was legally justified in using "force reasonably necessary to restrain" Plaintiff and (2) Officer Ali is entitled to official immunity (Dkt. 60-1 at 21-22).

As to the first argument, the Court has already explained a jury could conclude Officer Ali's conduct was neither justified nor reasonable. As to the second argument, official immunity applies only if the officer did not act "'with actual malice or intent to injure.'" *Massie v. Cobb Cty., Ga.*, 255 F. Supp. 3d 1302, 1310 (N.D. Ga. 2017) (quoting *Dukes v. Deaton*, 852 F.3d 1035, 1044 (11th Cir. 2017)). Actual malice means "a deliberate intention to do wrong." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007). "[A] jury can infer actual malice based on an officer's conduct." *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (citing *Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga. Ct. App. 2014)).

---

[11] The Court recognizes *Gomez* and other cases cited herein are unpublished, non-binding opinion but finds them instructive all the same. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

Given the nature of Plaintiff and Officer Ali's encounter, a reasonable jury could conclude Officer Ali acted with actual malice. The evidence suggests the tension between Officer Ali and Plaintiff escalated until Officer Ali reached for Plaintiff's phone. It began with the dispute about Plaintiff wearing headphones and—according to Plaintiff—Officer Ali aggressively telling him to remove them. (Dkt. 80 ¶¶ 10–12.) Officer Ali did not care that Plaintiff said he was not listening to music (but merely had them in his ears) because Officer Ali considers it "disrespectful" to wear headphones while speaking with someone else. (Dkt. 80 ¶ 16.) It continued with Officer Ali—again, according to Plaintiff—telling him, "[Y]ou think you're tough. If anything, you'll go to jail and I'll go home." (Dkt. 80 ¶ 17.) Officer Ali denied saying those exact words or threatening Plaintiff in an aggressive way. (*Id.*) The Court cannot resolve this factual dispute or decide as a matter of fact Officer Ali's state of mind. A jury might well believe Plaintiff and, from all the evidence, conclude Officer Ali intended to do Plaintiff harm by pushing him onto the baggage carousel. Summary judgment is, thus, unavailable.

## ii. False Imprisonment

The United States says Plaintiff's false imprisonment claim fails because his detention was reasonable as a matter of law because it occurred at the border.  (Dkt. 60-1 at 23.)  "The essential element of false imprisonment is an unlawful detention."  *Lewis v. Ritz Carlton Hotel Co., LLC*, 712 S.E.2d 91, 93 (Ga. Ct. App. 2011).  "Routine searches of the persons and effects of entrants [at the border] are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

Plaintiff's false imprisonment claim rests on his allegation that Officer Ali "asserted invalid legal authority to falsely imprison him." (Dkt. 1 ¶ 89.)  To start, the Court does not consider anything that occurred while Plaintiff and the officers were tussling on the baggage carousel as a detention or arrest.  Everything that happened on the baggage carousel was a direct result (and continuation) of Officer Ali's initial (and potentially unreasonable) use of force.  Any injury he suffered because of the physical altercation can be addressed as part of Plaintiff's claims for excessive force under the Fourth Amendment or assault and battery under state law.

The only "detention" that occurred outside of that scuffle was Plaintiff's detention for secondary inspection both before and after his altercation with the officers. And Officer Ali did not need to assert any legal authority for that detention because it happened at the border as part of his law enforcement duties. *Denson*, 574 F.3d at 1339. Importantly, Plaintiff presented no evidence Officer Ali detained him for longer than necessary to complete the border search. Granted, Plaintiff has presented evidence he received medical treatment during the detention. But he has presented no evidence the medical care lengthened his detention beyond the time necessary to complete the secondary inspection. So he has presented no evidence of an unlawful detention. *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) ("A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."). Plaintiff's state law claim for false imprisonment thus fails as a matter of law. Plaintiff's constitutional claim for false arrest also fails because false arrest occurs only when an officer does not have a warrant or probable cause, neither of which was required here for the border detention. *See Jones v. Brown*, 649 F. App'x 889, 890 (11th Cir.

2016) (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010)).

### III. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** the United States's Motion for Summary Judgment (Dkt. 60). The Court grants summary judgment in favor of the United States only on Plaintiff's claims for intentional infliction of emotional distress, false imprisonment, and negligence under Georgia law and for unlawful detention and false arrest under the Fourth Amendment. Plaintiff's other claims survive. Pursuant to the Court's Consent Protective Order (Dkt. 40), the Court **GRANTS** the United States's Motion to File Documents Under Seal (Dkt. 63), and Plaintiff's Motion to File Documents Under Seal (Dkt. 69) and Second Motion to File Documents Under Seal (Dkt. 75).[12]

The Court **ORDERS** this case to mediation. The parties may retain a private mediator at their own expense. Or they may ask the Court to appoint a magistrate judge to conduct the mediation. The parties are not

---

[12] While the Court seals Plaintiff's and Officer Ali's full deposition transcripts, it concludes none of the portions it quotes from those transcripts is highly confidential under the Consent Protective Order. (Dkt. 40.) Accordingly, it does not redact those portions from this Order.

required to pay for mediation by a magistrate judge.

The parties shall advise the Court of their mediation preference no later than 30 days after the date of this Order.  If the parties elect to retain their own mediator, they shall identify the mediator no later than 45 days after the date of this Order.  Mediation must occur within 90 days after the date of this Order.  The parties must have present at the mediation a person with authority to settle this litigation.  The parties shall file a report on the outcome of their mediation no later than 7 days after the mediation concludes.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 22nd day of September, 2023.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE